UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NEW ENGLAND HORSEMEN'S BENEVOLENT AND PROTECTIVE ASSOCIATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> MASSACHUSETTS THOROUGHBRED HORSEMEN'S ASSOCIATION, INC. AND MIDDLEBOROUGH AGRICULTURAL SOCIETY, <br><br> Defendants. | Civil Action No. |

## VERIFIED COMPLAINT

Plaintiff New England Horsemen's Benevolent and Protective Association, Inc. ("Plaintiff" or "NEHBPA"), by its counsel, Raphael LLC, hereby files this Verified Complaint against Defendants Massachusetts Thoroughbred Horsemen's Association, Inc. ("MTHA") and Middleborough Agricultural Society ("MAS") (collectively, "Defendants").

## INTRODUCTION

1.      This case involves the protection and rights of owners and trainers of thoroughbred horses in the Commonwealth of Massachusetts.  For decades, the NEHBPA has solely represented thousands of owners and trainers of thoroughbred horses (collectively, "horsemen") in the Commonwealth of Massachusetts.

2.      In this capacity, the NEHBPA, on behalf of horsemen who race in Massachusetts, negotiates and executes contracts with local racetracks.  The NEHBPA advocates in the collective best interests and rights of the horsemen.

3.      Despite the NEHBPA's long-established history of representing horsemen, the MTHA, a newly formed organization consisting of a few disgruntled members of the NEHBPA, has unlawfully attempted to usurp and interfere with the NEHBPA and its role as the horsemen's representative organization.

4.      The MTHA has had no elections and adopted no rules governing the organization. Its officers are self-appointed.  Upon information and belief, few, if any, horsemen (as that term is defined by the Interstate Horseracing Act, 15 U.S.C. § 3001, *et seq.* ("IHA")) have consented to be governed by this organization.

5.      The MTHA has entered into a purse contract with the MAS to conduct live thoroughbred racing at the Brockton Fairgrounds and possible other locations during the calendar years 2016 and 2017.

6.      In this purse contract, the MTHA has purportedly given its consent, on behalf of horsemen who race in Massachusetts (who it does not represent), for the MAS to transmit the live signal of races conducted at the Brockton Fairgrounds (and possibly other locations) to other facilities.  Such approval is in violation of the IHA as the MTHA is not the "horsemen's group" authorized to give such consent as defined in the IHA.

7.      Furthermore, the MTHA has not acted in the best interests of the horsemen in negotiating with the MAS.

8.      For example, MAS is controlled by George L. Carney, Jr.  Mr. Carney is also the principal owner and chief executive officer of the Raynham Park facility in Raynham, Massachusetts.  Under Massachusetts law, the Raynham Park facility was required pay approximately three hundred thousand dollars ($300,000) in statutorily mandated premiums owed on account of thoroughbred interstate wagers to Suffolk Downs for 2014 and 2015.  These

premiums are required to be deposited into the purse account of the horsemen.  The Raynham

Park facility failed to pay these purse premiums for 2014 and 2015.  As a result of this failure to

pay, Suffolk Downs refused to make payments due to the horsemen under its 2014 purse

agreement with the NEHBPA.  The MTHA failed to address this issue with Mr. Carney and the

NEHBPA is concerned that the MAS (under the control of Mr. Carney) will continue to divert

simulcasting money to the detriment of the horsemen.

9.      Further, the race track at the Brockton Fairgrounds is not safe for racing in its

current state.  The race track is a five-furlong bullring race track.  It is significantly less than one

mile in circumference and narrow.  This renders the race track extremely dangerous to the

thoroughbreds racing there and to the jockeys riding them if proper safeguards are not in place.

Indeed, the race track has not been utilized since 2001, after a tragic accident occurred there.

During the fourth race on opening day of the meet in 2001, four of the seven thoroughbreds were

injured competing in that race.  As a result of that accident, two of the four injured

thoroughbreds had to be humanely destroyed.  Nevertheless, the MTHA has agreed to race at the

Brockton Fairgrounds without ensuring that track management took the necessary steps to

minimize the risks of racing at this dated facility and to improve horse and jockey safety.

## PARTIES

10.     The NEHBPA is a Massachusetts non-profit corporation that maintains its

principal office at 525 McClellan Highway, East Boston, Massachusetts 02128.

11.     The MTHA is a Massachusetts non-profit corporation with its principal office

located at 36 Witherbee Avenue, Revere, Massachusetts 02151.

12.     The MAS is a Massachusetts non-profit corporation with its principal office

located at 433 Forest Avenue, Brockton, Massachusetts 02301.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over those claims alleged herein that arise under the IHA.

14.     This Court has supplemental jurisdiction over those claims alleged herein that arise under state law pursuant to 28 U.S.C. § 1367(a), as those state law claims form part of the same case or controversy as the federal claims arising under the IHA.

15.     Venue in the District of Massachusetts is proper pursuant to 28 U.S.C. § 1391(b) because all Defendants reside within this District and a substantial part of the events giving rise to the claims alleged herein occurred in this District.

## FACTUAL BACKGROUND

16.     The NEHBPA was incorporated in Massachusetts in 1992 and has been the sole organization representing horsemen who race in Massachusetts since that time.  It is governed by a Constitution and Bylaws, as most recently revised on July 1, 2015, and has an elected Board of Directors and executive officers.  It has committees and holds general membership meetings each year.  It is affiliated with a national organization, the National H.B.P.A., Inc.  There are approximately eight hundred twenty-six (826) members of the NEHBPA.

17.     The purpose of the NEHBPA, as stated in its Constitution and Bylaws, is to, *inter alia*, represent all horsemen in negotiations with thoroughbred racetrack operations and other necessary parties.  This representation advocates in the best interests and property rights of the horsemen on various subjects involved in these negotiations.  Such subjects include:  purse monies; purse contracts; sale of live racing signal; pony lead fees; television rights; inter-track wagering contracts and fees; off-track betting contracts and fees; simulcasting contracts and fees;

phone and Internet betting contracts and fees; Market Area contracts and fees; safety, repair, and improvement of all racetrack facilities; and all other matters of interest that may affect horsemen.

18.     The MTHA was formed in 2015 by a few disgruntled members of the NEHBPA who were unsuccessful candidates in the most recent NEHBPA election conducted in September 2014.  (The NEHBPA Bylaw provides for elections every three years, and so the next election is anticipated in the fall of 2017).  The MTHA self-appointed president is William Lagorio.  Mr. Lagorio is a former race trainer.  He raced only **1 horse** on one occasion in 2015.  He has no record of training in 2016.  In essence, Mr. Lagorio currently is not a horseman, yet he has appointed himself president of the MTHA.

19.     The MTHA has no infrastructure and has yet to conduct an election of a board of directors.  Its actions are apparently governed by one man – William Lagorio.  It also has no national affiliation and has been issued a cease and desist letter by the national Thoroughbred Horsemen's Associations, Inc. objecting to the use of the name and mark of MTHA and the national Thoroughbred Horsemen's Associations, Inc. ("THA"), which has affiliated horsemen organizations in several states.  Upon information and belief, despite receipt of the cease and desist letter, the MTHA continues to use the name and mark of MTHA and the national THA.  A copy of that cease and desist letter is attached hereto as Exhibit A.

20.     To the extent the MTHA does claim to have members who are owners or trainers of thoroughbred horses that have raced in Massachusetts, those horsemen are also NEHBPA members and continue to be represented by the NEHBPA.

21.     The MTHA has made false and defamatory statements regarding the NEHBPA on its website.  The MTHA has attacked the NEHBPA's reputation and integrity by stating that the NEHBPA is not acting in the best interests of the horsemen and is somehow mishandling or

misusing funds allocated for the benefit of the horsemen.  These statements are patently false.  A

few examples of such statements include:

a. "The HBPA has apparently suspended disbelief that it no longer represents the
majority of local horsemen in the Commonwealth, asserting among other
allegations, it remains relevant as a legitimate representative of local horsemen,
which is greatly in dispute, despite the horsemen group's Boards demonstrated
inability to secure or conduct more than a few days of live racing in 2015, largely
benefiting a select group of out of state owners and trainers."
http://www.masstha.com/?p=208 (accessed May 20, 2016).

b. "It has become clearly evident over the last several months the HBPA has
abandoned its primary purpose of benevolence and protection of local horsemen
in favor of a 'pie in the sky' equine center to replace the aging Suffolk facility and
replace the uninterested Suffolk / Sterling race association."
http://www.masstha.com/?p=208 (accessed May 20, 2016).

c. "Our work is just beginning, Suffolk Downs and the HBPA now advocate the idea
that they should be able to offer a $25,000 purses for their $5,000 to $10,000
claiming races (with their notion of local horse preference). The same horses
races at Brockton are anticipated to run for between $10,000 and $12,000. We
cannot allow the race horse development fund to be utilized in such an
irresponsible manner nor for purposes other than those that directly benefit our
local horsemen. The sucking sound you hear is race horse development funds
being diverted to out of state horsemen by a group with no interest in reviving the
industry but to sustain an aging facility slated for an other use."
http://www.masstha.com/?p=109 (accessed May 20, 2016).

d. "Our future is now, you must become active and involved. This is your industry
and this is your home base. The Race Horse Development Fund is there because
you earned it. It does not belong to Suffolk Downs or the HBPA, it belongs to the
local horsemen and there are very few of those left in the HBPA or supporting
this arrangement."  http://www.masstha.com/?p=109 (accessed May 20, 2016).

e. "Gulp! What a tag line for a membership drive or retention program. It's
reminiscent of British revolutionary war regiments, marching in droves, only to
be mowed down by the locals like tin ducks at a carnival joint. Yes, Step right up,
you could be the next lucky casualty  waiting out the HBPA's long term vision of
petitioning the Massachusetts State Legislature to float millions in bonds so these
smooth operators can find land, develop plans, obtain financing, go over budget
and sink thoroughbred racing for good.
Yes there will be casualties. I predict it will be the HBPA members and then their
board, many of which will be seeking cover in that carnival joint behind the few
tin ducks left standing.
I'm sorry, but featuring your intention to abandon sustained racing in 2016 for an

uncertain proposal in the next millennium is no way to pack the midway, or for that matter, fill member seats at your next general membership meeting." http://www.masstha.com/?p=155 (accessed May 20, 2016).

f.   "Rather than morphing into a racing association, land speculator, financier and debt ridden entity, this faction has recognized its primary duty to represent horsemen in their quest of doing what they do best, race and race often, under the flag of a real race association, utilizing their own funds and resources and not our race horse development fund (RHDF) as a piggy bank." http://www.masstha.com/?p=155 (accessed May 20, 2016).

**BROCKTON RACING**

22.    In 2014, Mr. Carney announced plans to re-open the Brockton Fairgrounds racetrack and commence racing in 2015.  Brockton did not re-open.

23.    In 2015, the MAS submitted an application to the Massachusetts Gaming Commission ("MGC") to run a fifteen-day live racing meets at the Brockton Fairgrounds racetrack in 2016.  A copy of that application is attached hereto as Exhibit B.  The application did not include many of the necessary items required by the MGC to run a meet, including information relating to purse agreements with the horsemen and safety measures adopted by the track.

24.    At the same time, the Brockton Agricultural Society ("BAS") (also controlled by Mr. Carney) submitted an application to run a second fifteen-day live racing meet at the Brockton Fairgrounds racetrack.  The BAS application had the same deficiencies as the MAS application and did not address the issues of horse and jockey safety.  A copy of that application is attached hereto as Exhibit C.

25.    Despite these deficiencies, the MGC approved the applications and granted the BAS and the MAS the license to run a meet.

26.    Upon the initial public undertakings by Mr. Carney relative to his intent to conduct thoroughbred racing in Massachusetts, NEHBPA counsel reached out to the MAS and

the BAS through Mr. Carney on multiple occasions seeking to negotiate a purse agreement between the horsemen and the MAS and the BAS and to facilitate the conduct of a safe live race meet.  Copies of two of the communications to Mr. Carney are attached hereto as Exhibit D and E.  Mr. Carney refused to negotiate with the NEHBPA and otherwise permit the NEHBPA to aid him in taking appropriate steps to enhance the safety of horses and jockeys that may participate in the meet if conducted.   Mr. Carney refused to meet or have any discussions with the NEHBPA.

27.     Upon information and belief, Mr. Carney has refused to negotiate with the NEHBPA because he knows that the NEHBPA will require that Mr. Carney pay the required statutory premiums owed by his Raynham Park simulcasting facility.  That facility has failed to pay approximately three hundred thousand dollars ($300,000) in statutorily mandated premiums owed on account of thoroughbred interstate wagers to Suffolk Downs for 2014 and 2015.  These premiums are required to be paid from the revenue generated from simulcasting at the Raynham facility.  That facility has wrongfully converted to its own use the portion of the premiums required by Massachusetts law to be paid to the horsemen's purse account (via payment remitted to Suffolk Downs).  As a result of this failure to pay, Suffolk Downs refused to make payments due to the NEHBPA under its 2014 purse agreement with the NEHBPA to the financial detriment of the horsemen.  Suffolk Downs has filed a Petition with the MGC to suspend Raynham Taunton's simulcasting license.  A copy of that petition is attached hereto as Exhibit F.

28.     By dealing with Mr. Lagorio and the MTHA and avoiding the NEHBPA, Mr. Carney can conduct a live racing meet without addressing the issue of his failure to pay the required premiums to the thoroughbred purse account and divert funds from the Race Horse Development Fund ("RHDF").

29.     In early 2016, Mr. Carney announced that he had reached an agreement with the MTHA regarding purses for the MAS meet.  These negotiations and purse agreement were illegal under federal law and state law.

30.     The BAS indicated that it would withdraw its request and not run a meet, however the MAS would proceed with a July, 2016 live race meeting.

31.     In order to conduct a live race meeting in Massachusetts, the track operator is mandated to negotiate with a horsemen's organization.  The MTHA is not a horsemen's group under Massachusetts or federal law.  It is an impostor organization created by one man to divert funds from the RHDF.

32.     In negotiating the purse agreement, the MTHA failed to advocate for the interests of the horsemen.  Namely, it neglected and failed to address multiple safety issues with the Brockton Fairgrounds.  The track is a bullring racetrack and safety precautions need to be taken with respect to the grading of the surface, the stables, and the facilities for backside workers and the jockeys and the horses that race and train there.  The MTHA failed to advocate in any way for the safety of the participants in the Brockton meet and the track is presently unsafe for any form of racing.

33.     The MTHA failed to negotiate any provisions for the horsemen regarding:

A.   Stall security and proper bedding material for stalls;

B.  The composition of soil for the track;

C.  Depth of topsoil on the track;

D.  Harrowing procedures and schedule for the track;

E.  Watering schedule for the track;

F.   Stone picking procedures to avoid horses stepping on stones and developing

laminitis;

G.   Soil testing procedures;

H.   Adequate facilities for backside workers;

I.   Racehorse safety and retirement protocols; and

J.   Jockey safety.

34.     A copy of the purported Recognition and Purse Agreement by and between the

MTHA and the MAS is attached hereto as Exhibit G.  That agreement provides, inter alia:  (a)

that the MAS "*shall not be making any payments to purses or the Purse Account, and MAS shall

not be making any payments to MassTHA or the Horsemen for any other reason.*" (Section 3.2);

(b) that the MTHA would pay to the MAS ten percent of the total purse payments that are paid to

the horsemen with a guaranteed minimum (unstated) payment (Section 3.3); (c) that "*MAS shall

have no liability or responsibility of any kind for the Horsemen's personal property; all risks of

loss for such personal property remains with the Horsemen.*" (Section 4.3); (d) that "*Insurance

coverages that must be maintained by the Horsemen* (presumably for the benefit of the MAS)

*shall be negotiated and agreed to before conducting live racing.  MAS shall not be required to

maintain any insurances coverages for the benefit of the Horsemen or MassTHA unless required

to do so by the Commission or by law.*" (Section 4.4); and (e) that the MTHA, misrepresenting

itself "*as the authorized representative of the Horsemen for interstate simulcasting purposes

hereby provides all consents and approvals as required by the Interstate Horse Racing Act of

1978, P.L. 95-515, as amended (the "Interstate Horse Racing Act") and M.G.L. chapters 128C

and 23K, including its consent and authorization for MAS to negotiate and contract with

simulcast and receiving facilities, including off-track wagering facilities outside the*

*Commonwealth of Massachusetts, for (i) the conduct of off track wagering at MAS' Racetrack and (ii) off-track wagering on live thoroughbred races emanating from MAS' Racetrack. This Agreement constitutes the contract required by Section 3004(a) of the Interstate Horse Racing Act. It is further agreed that all simulcast payments that MassTHA might have received from MAS pursuant to the Interstate Horse Racing Act shall be retained by MAS.*" (Section 5.4).

35.     Essentially, the MTHA purported to grant to the MAS the approval the MAS requires to simulcast and conduct off-track wagering. The MTHA granted this approval without negotiating for the benefit of the horsemen any share of the revenue generated. Instead, the MTHA agreed that the MAS could retain all profits realized as a result of the horsemen's rights it gifted to the MAS.

36.     In addition to this gift to the MAS, the MTHA agreed to kickback to the MAS 10% of the Purse Funding received from the RHDF created by state law in the legislation authorizing casinos and a slot parlor. The RHDF is intended by statute to supplement other statutory and non-statutory sources of purse funding.

37.     A reading of the entire contract suggests there was absolutely no bargaining or advocacy by MTHA on behalf of the horsemen. The MTHA, through the actions of an un-elected president, appears to have simply permitted the MAS to draft a contract as desired by the MAS and signed it.

38.     The horsemen receive no benefits from the Recognition and Purse Agreement between the MTHA and the MAS. The MTHA gave away all revenue sources for purses other than funding from the RHDF and gave away 10% of the RHDF purse funding in order to advance its own objectives at the expense of the horsemen it purported to represent.

39.     Under regulations recently adopted by the MGC, by reason of entering into this Recognition and Purse Agreement, the MTHA is likely to receive hundreds of thousands of dollars from the RHDF in funding for benefit programs the MTHA has yet to adopt.

40.     The funding to be paid to the MTHA from the RHDF will directly reduce the funding being paid to the NEHBPA Benefit Trust and the NEHBPA Assistance Fund that has been providing benefits to horsemen for decades pursuant to established benefit programs.

41.     Further, the MTHA members who are horsemen are presently eligible for benefits under the NEHBPA benefit programs.  Thus, diversion to the MTHA of one-half of RHDF benefit funding as provided by the recently adopted MGC regulations will allow MTHA members who are horsemen to double dip and secure benefits from both organizations.

42.     Additionally, as a condition of obtaining any stalls at the MAS meet to race horses, a Massachusetts horseman has to completely release and indemnify the MAS with respect to any and all liability for all acts including accidents at the meet due to MAS negligence or MAS bad acts.  This is completely unreasonable.  A copy of the 2016 stall application is attached hereto as Exhibit H.

43.     Also, in order to induce the MAS' approval of the application for stalls, a horsemen must "consent to all Simulcasting both within the state of Massachusetts and with other jurisdictions to which MAS is a party."  (Ex. H, Stall Application).  This provision violates the IHA, which requires consent from the authorized horsemen's group.

44.     Finally, to obtain a stall at the MAS meet, by signing the application, a horseman has to consent to disfranchisement by agreeing to the following provision.

   "**By signing and submitting this stall Application the undersigned does hereby appoint the Massachusetts Thoroughbred Horsemen's Association, Inc. ("MassTHA") to act as its sole and exclusive representative for the purposes of negotiating and executing, or refusing to execute, with Middleborough Agricultural**

**Society any and all contracts and agreements relating to Thoroughbred Racing at the Brockton Fairgrounds during the subject racing meeting, and I hereby revoke any previous authorizations or recognitions that are in conflict with the foregoing.**"

(Ex. H, Stall Application).

## CLAIMS

## COUNT I – VIOLATION OF INTERSTATE HORSERACING ACT, 15 U.S.C. § 3001, *et seq.*

45.     Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-44 above.

46.     The MTHA has entered into a purse contract with the MAS to conduct live thoroughbred racing at the Brockton Fairgrounds.

47.     In this purse contract, the MTHA has given its consent, on behalf of the horsemen who race in Massachusetts, for the MAS to transmit the live signal of races conducted at the Brockton Fairgrounds to other facilities and to conduct off-track wagering.

48.     Such approval is in violation of the IHA as the MTHA is not the "horsemen's group" authorized to give such consent as defined in the IHA.

49.     The MAS has also violated the IHA by requiring horsemen to give consent to simulcasting in order to induce the MAS' approval of an applicant's Stall Application.  Such approval may only be given by a "horsemen's group" as defined in the IHA.

50.     15 U.S.C. § 3004(a)(1)(A) provides: "An interstate off-track wager may be accepted by an off-track betting system only if consent is obtained from . . . the host racing association, except that . . . as a condition precedent to such consent, said racing association . . . must have a written agreement with the horsemen's group, under which said racing association may give such consent, setting forth the terms and conditions relating thereto . . ."  15 U.S.C. § 3004(a)(1)(A).

51.     "Horsemen's group" is defined in 15 U.S.C. § 3002(12) as: "[W]ith reference to the applicable host racing association, the group which represents the majority of owners and trainers racing there, for the races subject to the interstate off-track wager on any racing day."  15 U.S.C. § 3002(12).

52.     The NEHBPA represents the majority of owners and trainers racing in Massachusetts.

53.     Under the IHA definition, until a race occurs at a racetrack and the majority of horsemen elect a different organization to represent their interests, the NEHBPA continues to represent the majority of horsemen who race in Massachusetts.  *See* 15 U.S.C. § 3002(12).  Thus, the MTHA simply cannot unilaterally usurp the NEHBPA by proclaiming it now represents horsemen who race in Massachusetts and enter into contracts on their behalf.

54.     The NEHBPA has previously represented the horsemen and negotiated and entered into a purse contract on their behalf at each and every thoroughbred meet previously conducted at the Brockton Fairgrounds.

55.     The MTHA and the MAS have violated the IHA by entering into a purse contract in which the MTHA purports to give consent to simulcast the live races at the Brockton Fairgrounds.

56.     In fact, the MAS does not have the consent of the NEHBPA, the legitimate horsemen's group as defined in the IHA, to simulcast the live races at the Brockton Fairgrounds in 2016 and 2017.  The facility is unsafe as currently constituted.

## COUNT II – DECLARATORY JUDGMENT
### Pursuant to 28 U.S.C. § 2201(a), the IHA, and M.G.L. c. 23K § 60

57.     Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-56 above.

58.     As set forth above, the MTHA is not a "horsemen's group" as defined in 15 U.S.C. § 3002(12).  As such, it is not authorized to give consent to the MAS to accept interstate off-track wagers in any purse contract or otherwise grant any approval of horsemen pursuant to the IHA.

59.     Thus, Plaintiff requests that the Court enter:

   a. A declaratory judgment that the NEHBPA is the sole and exclusive "horsemen's group" authorized to negotiate on behalf of horsemen who race in Massachusetts and give consent to interstate off-track wagers in any contracts on their behalf;

   b. A declaratory judgment that the MTHA is not authorized to enter into contract with the MAS for thoroughbred racing in 2016 and/or 2017;

   c. A declaratory judgment that the MTHA and its members are not authorized to receive any funds from the Race Horse Development Fund;

   d. A declaratory judgment that the MAS is in violation of the IHA by permitting the acceptance of interstate off-track wagers on the MAS' live races without the consent of the NEHBPA as the authorized horsemen's group;

   e. A declaratory judgment that the Recognition and Purse Agreement dated April 19, 2016 attached hereto as Exhibit G between the MTHA and the MAS is null and void and in violation of the IHA by permitting the acceptance of interstate off-track wagers on the MAS' live races without the consent of the NEHBPA as the authorized horsemen's group.

## COUNT III – TORTIOUS INTERFERENCE WITH ADVANTAGEOUS RELATIONS

60.     Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-59 above.

61.     As the sole organization authorized to represent horsemen who race in Massachusetts in connection with entering contracts on behalf of the horsemen for the 2016 summer season, the NEHBPA had an advantageous relationship with the MAS to contract with the MAS for the thoroughbred racing proposed to be conducted by the MAS.

62.     The MTHA knowingly induced a breaking of this relationship by purporting to represent horsemen who race in Massachusetts and entering into a contract with the MAS for the 2016 summer season.

63.     The MTHA's interference with the NEHBPA's relationship with the MAS was improper in motive and/or means as the MTHA improperly bargained away the rights of their horsemen to advance its own interests to the detriment of the horsemen represented by the NEHBPA.

64.     The NEHBPA and its members who are horsemen have been economically harmed by the MTHA's actions as the NEHBPA has not entered into a purse contract for the thoroughbred racing by the MAS approved by the MGC for 2016 and other racing in 2016 or 2017 as may be approved by the MGC; by the gift of simulcasting and off-track wagering rights pursuant to the IHA without fair and just compensation to horsemen; and by the kickback to the MAS of 10% of the RHDF funding intended by statute to supplement purses for horsemen.

## COUNT IV - DEFAMATION

65.     Plaintiff incorporates herein by reference the allegations set forth in Paragraphs 1-64 above.

66.     The MTHA published false and defamatory statements on its website regarding the NEHBPA as specified above.  The statements indicate that the NEHBPA has mishandled the funds allocated for the benefit of horsemen for its own benefit or not for the benefit of horsemen.

67.    These statements are patently false and defamatory.  They have damaged NEHBPA's reputation of representing the best interests of horsemen racing in Massachusetts.

68.    The NEHBPA also has suffered monetary loss in the loss of the purse contract with the MAS.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

1.    Enter a declaratory judgment that the NEHBPA is the sole and exclusive "horsemen's group" authorized to negotiate on behalf of horsemen who race in Massachusetts and give consent to interstate off-track wagers in any contracts on their behalf;

2.    Enter a declaratory judgment that the MTHA is not authorized to enter into contract with the MAS for thoroughbred racing in 2016 and/or 2017;

3.    Enter a declaratory judgment that the MTHA and its members are not authorized to receive any funds from the Race Horse Development Fund;

4.    Enter a declaratory judgment that the MAS is in violation of the IHA by permitting the acceptance of interstate off-track wagers on the MAS' live races without the consent of the NEHBPA as the authorized horsemen's group;

5.    Enter a declaratory judgment that the Recognition and Purse Agreement dated April 19, 2016 attached hereto as Exhibit G between the MTHA and the MAS is null and void and in violation of the IHA by permitting the acceptance of interstate off-track wagers on the MAS' live races without the consent of the NEHBPA as the authorized horsemen's group;

6.    Order that the MAS negotiate with the NEHBPA for a purse contract for thoroughbred racing in 2016 and 2017 and secure the consent of the NEHBPA before the MAS

may conduct off-track wagering, simulcast its races, accept interstate wagers, and accept any form of purse funding from the Race Horse Development Fund;

       7.      Award Plaintiff its damages, together with interest, costs, and attorneys' fees; and

       8.      Award such other and further relief as the Court deems appropriate.

## <u>REQUEST FOR JURY TRIAL</u>

Plaintiff hereby requests that this case be tried before a jury on all counts so triable.


Dated:   June 9, 2016                       NEW ENGLAND HORSEMEN'S
BENEVOLENT AND PROTECTIVE
ASSOCIATION, INC.,

By their attorneys,


/s/ *Neil D. Raphael*
Neil D. Raphael (BBO #650453)
Natalie F. Langlois (BBO #669247)
RAPHAEL LLC
1 Liberty Square
11th Floor
Boston, Massachusetts  02109
Tel.:  617.542.7900
Fax:  617.307.4486
nraphael@raphaelllc.com
nlanglois@raphaelllc.com

18

## VERIFICATION

I, Bruce Patten, declare under pains and penalty of perjury that I am Acting Executive Director of the New England Horsemen's Benevolent and Protective Association, Inc., the Plaintiff named and described in the foregoing Verified Complaint, that I have read the foregoing Verified Complaint, and that the facts alleged therein are true and correct of my own personal knowledge, except for those matters alleged to be on information and belief, and as to them, I believe them to be true and correct.

Bruce Patten